RECEIVED
IN ALEXANDRIA, LA.

AUG 2 5 2014

TONY R. MOORE, CLERK
        DEPUTY

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

| | | |
|---|---|---|
| **TURFGRASS GROUP, INC., et al** | : | **DOCKET NO. 3:10-1354** |
| **VS.** | : | **JUDGE TRIMBLE** |
| **NORTHEAST LOUISIANA TURF FARMS, LLC, ET AL** | : | **MAGISTRATE JUDGE HAYES** |

## MEMORANDUM RULING AND ORDER

Before the court is "Defendants' Motion to Exclude the Report, Opinions and Testimony of Plaintiffs' Expert, Donald Davis"(R. #79) wherein defendants, Northeast Louisiana Turf Farms, LLC and Jeffery Clifton Nicolle seek to exclude the testimony and report of plaintiffs' expert because it is allegedly unreliable, wrongfully includes certain elements of damages, is subjective and a novel concept, and is not reliable.

Plaintiffs allege in their complaint that defendants, Northeast Louisiana Turf Farms, LLC and Jeffery Clifton Nicolle, purchased thirty boxes of TifBlair certified seed from The Patten Seed Company, a retail outlet; the packaging was designed for sale to the home turf market. TifBlair is a centipede grass variety that is protected by Plant Variety Protection Certificate Number 9600255. An exclusive Plant Variety Protection Certificate was issued to the University of Georgia Research Foundation, Inc.("UGRF") which allows UGRF to make, have made, use, sell and offer for sale TifBlair. UGRF issued an exclusive Seed Supply and Sublicense Agreement to the Turfgrass Group, Inc. "(Turfgrass"). The Certificate gives the breeder or an assignee the right to exclude others from selling the variety, or offering it for sale, or reproducing it without permission of the owner. The owner of the PVPA certificate has the right to control the usage of the invention (seed and sod) for

a period of twenty years.[1]  Turfgrass is in the business of producing, marketing, licensing and selling protected certified grass seed and sod nationally through a variety of organizations and obtained a license giving it exclusive rights to PVPA protected TifBlair. Turfgrass is required to provide notice on the seed and sod that TifBlair is protected by the Plant Variety Protection Act ("PVPA").[2] Owners of a Certificate have a civil remedy for infringement of plant variety protection including an injunction and damages to compensate for the infringement, but in no event less than a reasonable royalty together with interest and costs.[3]

Plaintiffs allege that defendants had actual notice and knowledge that TifBlair was federally protected by the PVPA.  Plaintiffs also allege that defendants infringed upon plaintiffs' protect rights by marketing, conditioning, offering, exposing and stocking for sale TifBlair without the required PVPA notice and without the authority of Turfgrass to sell or market TifBlair.  Specifically, plaintiffs allege that defendants planted the TifBlair seed on its sod farm for resale and thereafter harvested the illegal sod and sold or offered for sale sod from the harvest without restriction and without proper authority from Turfgrass oR UGRF. Plaintiffs further alleged that defendants failed to properly mark TifBlair in connection with transfers which constitutes a separate violation OF the PVPA for each sale made. In other words, defendants purchased from an authorized dealer TifBlair seed and instead of planting it for the home turf market, defendants diverted the seed from authorized use to illegally reproducing it and selling it for sod over a period of years.

---

[1] 7 U.S.C. § 2483.

[2] The PVPA provides "patent-like" protection to the owner of a novel plant variety. A sale, offer for sale, conditioning, shipping, storing and selling a protected plant variety without authorization and without the PVP notice of protection printed on each sale bag infringes on the rights of a PVPA certificate holder.

[3] 7 U.S.C. § 2564.

2

Plaintiffs seek damages for infringement of the PVPA and 7 U.S.C. § 25411(A) of the PVPA, an injunction pursuant to 7 U.S.C. § 2563 of the PVPA, and damages for violation of the Lanham Act[4], as well as treble damages and attorney fees pursuant to 7 U.S.C. §  2564 and 2565  of the PVPA.

Plaintiffs bear the burden of establishing the admissibility of Davis' opinions by a preponderance of proof.[5] Federal Rule of Evidence 702 provides the following regarding expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"The trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[6]   The party offering expert testimony must prove by a preponderance of the evidence that the proffered evidence satisfies the criteria of Federal Rule of Evidence 702.[7]  "The court must determine that the reasoning and methodology underlying the testimony is scientifically valid and that the reasoning and methodology can properly be applied to the facts in issue."[8]  Rule 702 has three

---

[4] The Lanham Act is federal authority for a trademark infringement claim and further prohibits any conduct such as unfair competition and false marketing.

[5] Cooper v. Smith & Nephew, Inc., 259 F.3d 194 (4th Cir. 2001).

[6] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993).

[7] Mathis v. Exxon Corp., 302 F.3d 448, 459-60 (5th Cir. 2002).

[8] Allen v. Pennsylvania Engineering Corp.,  102 F.3d 194, 196 (5th Cir. 1996) citing Daubert, 509 U.S. at 592-93.

3

major requirements: (1) qualifications, (2) reliability, and (3) relevance.[9]

Furthermore, this Court must fulfill a "gatekeeping role" that requires it to make a threshold "assessment of . . . whether the reasoning or methodology underlying the [expert] testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue."[10]  Throughout the evaluation, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.[11]

Defendants' complaints with respect to plaintiffs' expert, Donald Davis are as follows: (1) Davis has not specialized in marketing and had no experience or knowledge of the turfgrass industry, (2) Davis never directly communicated with plaintiffs in forming his opinion, (3) Davis did not review pictures, documents or acreage diagrams produced by defendants, (4) Davis first began rendering opinions on reasonable royalties in 2010, and plaintiffs' attorney is the only attorney that has ever hired Davis, (5) Davis has not published any writings on the PVPA trademark infringements or published any articles or writings related to calculating a reasonable royalty rate, (6) Davis has no knowledge as to the day-to-day operations of a turfgrass farm and has not been involved in any matters, personally or professionally involving turfgrass, (7) Davis does not know which states have authorized TifBlair dealers, and (8) Davis did not examine or review defendants' financial data.

In his report, Davis finds that the total damages from the defendants' infringements are as follows:

Established Royalty                                          $  209,664

---

[9]   Smith v. Fifthian, 2006 U.S. Dist. LEXIS 51054, *4-5 (W.D. La. July 26, 2006).

[10]   Daubert, 509 U.S. at 592-93, 97.

[11]   Id. at 589.

Additional Royalties based on infringement     <u>$1,617,408</u>

Total damages     $1,827,072

The first component, "Established Royalty" is based on the Sublicense Agreement used by Turfgrass when negotiating agreements with other lawful producers of the protected TifBlair variety. The second component, "Additional Royalties based on infringement" is an additional royalty rate that an infringer of the rights of a PVPA Certificate holder would pay under a "hypothetical negotiation". These two components are combined to determine the total reasonable royalty or alleged damages suffered by the plaintiffs from brand confusion, lost sales and market erosion. The calculations were based on a projected continuing infringement for 2007, 2008, 2009, 2010, and 2011.

Davis assumed that Northeast Louisiana Turf Farm ("NLTF") had 160 acres under TifBlair production. Defendants complain that Davis did not know if NLTF had a set price for all centipede grass and he did not consider the price difference between a dealer or broker pricing. Defendants further complain that Davis did not consider defendants' tax returns; he did not review financial or profit data, nor did he perform a market analysis for turf grass or TifBlair. Thus, defendants argue that the total damages of $1,827,072 far exceeds what the defendants profited during the entire history of their sod farming operations.

Defendants find fault with Davis' report in this case because it is "almost verbatim" the same as the report in another similar infringement case involving turf grass.[12] Defendants further attack Davis' report because in <u>Carolina Fresh Farms,</u> the district court granted a motion to exclude Davis'

---

[12] <u>The Turfgrass Group, Inc. and Univeristy of Georgia Research Foundatin, Inc. v. Carolina Fresh Farms, Inc., Carolina Fresh Farms, LLC f/k/a Carolina Fresh Farms, Inc. and John A. Fogle, Sr.,</u> Civ. Action No. 5:10-CV-00849, (U.S.D.C., District of South Carolina) Orangeburg Division.

5

report and testimony on damages. The court held that the opinion which was based on a study of a fictional centipede sod farm conducted by Louisiana State University which did not include any adjustment for relevant economic circumstances. Defendants maintain that just as was found in the Carolina Fresh case, Davis' opinion is not based on accepted methodology, has not been subjected to peer review or publication, and has not been generally accepted within the relevant scientific community.

*Qualifications*

Plaintiffs have procured Davis as their expert to provide damage calculations based on a reasonable royalty rate that has been utilized in the misappropriation of protected varieties (PVPA cases).Defendants maintain that Davis lacks the qualifications to serve as an expert witness regarding reasonable royalty rates for TifBlair. Defendants assert that even though Davis is a CPA, he has no training or education in agriculture, agribusiness, or agricultural economics and no education or training in marketing or economics. Defendants further assert that Davis has no education or experience in crop budgeting or expected profitability and no education or training in calculating royalty rates for varieties of crops or turf grass; furthermore, he has not presented any articles or research on reasonable royalty rates and has not lectured or received any education on the subject matter. Defendants recommend that plaintiffs employ an expert with knowledge of agricultural economics and market analysis for turf grass. Finally, as noted above, defendants inform the court that Davis' testimony and report was excluded in Carolina Fresh Farms, Plaintiffs note that the Carolina Fresh case is on appeal and that this court should not consider it as precedent.

Plaintiffs remark that Davis is certified in forensic accounting and among other things, has had experience with agricultural and farming intellectual property cases, reasonable royalty calculations and has testified in Federal Court in a reasonable royalty seed case. Davis further has

6

16 hours of college credit in Marketing, has worked on a farm, has served clients that have farms and has participated in budget entries for a farm as an actuary. Plaintiffs inform the court that Davis' opinions and qualifications have been challenged and accepted in numerous PVPA cases.[13] Plaintiffs note that Davis has provided damage analysis involving PVPA infringement for Syngenta,[14] AgSouth Genetics, Plantation Seed Conditioners, University of Georgia Research Foundation and Florida Foundation Seed Producers. Furthermore he has provided damages analysis as a consultant in PVPA and Lanham Act infringement cases that are considered pre-litigation as well as litigation matters. Thus, plaintiffs maintain that Davis is knowledgeable, has extensively researched and analyzed the topic of reasonable royalty in misappropriation of PVPA cases and has been admitted as meeting the requirements of Daubert.

Finally, plaintiffs assert that Davis extensively used the factors designated in Georgia Pacific v. United States Plywood Corp.,[15] and Panduit Corp. v. Stahlin,[16] to analyze defendants' illegal conduct and assess a reasonable royalty on the infringement committed and the hypothetical negotiation.[17] Thus, plaintiffs maintain that Davis' over twenty years experience as a certified public

---

[13] AGSouth Genetics, LLC, et al v. Leslie H. Cunningham, et al, Civil Action No. 09-745-C, (U.S. D.C. Southern Dist. of Alabama); AGSouth Genetics, LLC, et al v. Georgia Farm Services, LLC, et al, Civil Action No. 1:09-186 (U.S.D.C. Middle Dist. of Georgia); Plantation Seed Conditioners, Inc. et al v. Kinchafoonee Hardware, Inc., et al, Civil Action No. 1:09-00179 (USDC, Middle Dist. of Georgia).

[14] Sygenta is on of the top three largest proprietary seed germplasm owners in the United States.

[15] 318 F.Supp. 1116, 1120 (S.D. N.Y 1970).

[16] 575 F.2d 1152 (6th Cir. 1978) .

[17] A hypothetical negotiation was introduced in Georgia-Pacific, and is "[t]he amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time of the infringement) if both had been reasonably and voluntarily trying to reach an

7

accountant, forensic accounting experience, agriculture experience and participation in many litigation matters, providing research, financial analysis and expert opinions concerning damages in various subjects including the PVPA, qualifies him to provide an expert report, opinion and testimony.

Our objective is to decide whether Davis has sufficient specialized knowledge to assist jurors in deciding the particular issues in this case– specifically, the calculation of damages or loss for the infringement of a protected plant variety. The court finds that Davis' report and testimony may assist the trier of fact who will more likely than not be unaware of the market issues as well as how to quantify a measure of loss for the patent infringement. Accordingly, we find that Davis is qualified to offer an expert opinion as to damages in this case.

*Reliability*

Defendants complain that Davis' opinions are rooted in speculative assumptions and not facts. First, defendants assert that Davis assumes NLTF sold TifBlair since 2006 ( and sold the same amount from 2007-2010) and he assumes that the study from Louisiana correctly depicts profits for NLTF. Defendants argue that Davis' opinion is speculative and fails to bridge the analytical gap due to his failure to perform any analysis related to the facts of this matter.

Defendants note that Davis did not base his damage estimates on actual sales of TifBlair or common centipede during these years. Defendants further find fault in Davis' report because he did not perform any research or analysis to determine whether the market for centipede grass had

---

agreement; that is, the amount which a prudent licensee– who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention– would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license." Id. at 1120.

changed from 2006 to 2010. Defendants attack Davis' report and opinions because he is not aware of which states, including Louisiana, have authorized TifBlair dealers.

Defendants take issue with Davis' reliance on the academic study from Louisiana State University in rendering an opinion as to "lost profits." Defendants remark that Davis made no effort to alter the budget or the costs to the facts of this case or perform any methodology required of the study. Defendants suggest that the LSU study did not take into account costs associated with farming such as the cost of land, office and administrative costs, trucking and transportation costs and marketing costs. In other words, Davis did not take direct cost information from NLTF thus ignoring NLTF's production acreage, machinery costs, irrigation, fertilizer, chemical cost, farming labor, retail store expenses, office and administrative cost and significant marketing efforts. Finally, defendants complain that Davis failed to review any of NLTF's financial or accounting documentation to determine the profitability of selling of common centipede.

First, plaintiffs note that defendants admitted to plaintiffs' investigator that they purchased thirty pound packages of TifBlair with a PVPA notice on the packages that the individual seed packages are licensed for sale to the home turf market. Defendants then planted the seed on its sod farm and sold it commercially without plaintiff's authorization.

Plaintiffs inform the court that Davis' opinions on PVPA damage calculations and reasonable royalties have been accepted in several federal district courts and have faced challenges that defeated motions to exclude.[18] As to reviewing and relying on the NLTF's financial data, plaintiffs inform the court that defendants failed to produce reliable records of such in response to discovery requests and a subpoena duces tecum. Jeffery Nicolle testified in deposition that he did not have any documents

---

[18] See AG South Genetics, LLC, et al v. Leslie H. Cunningham, et al, supra.

9

to establish NFTL's turf grass inventory, grass produced, sold and/or purchased. Nicolle further testified that he did not write many receipts for the sod that he sold and that the deposits he turned in to his CPA would not match the receipts that he wrote for sod sold. Plaintiffs further illustrate the lack of sales receipt information through defendants' lack of response to interrogatories seeking information as to sales and/or the quantity and types of sod sold.  Thus, even if Davis had the tax returns of NLTF, it is quite obvious that they are not accurate because Nicolle admitted that they would not match the actual sales of sod by the farm.

Plaintiffs argue that because defendants do not have reliable sales records, plaintiffs have no other option in calculating a damages report. Plaintiffs assert that Davis' report relies upon dependable tests and studies done in 2006 in the State of Louisiana and reported in the Louisiana Agricultural Experiment Station, Department of Agricultural Economics and Agribusiness Information Series No. 139. Davis further relied on other relevant documents on intellectual property damages, agriculture, economics, case law and statutes.

In formulating his opinion as to the amount of reasonable royalty rate damages, Davis relied on 15 factors set forth in Georgia -Pacific Corp. v. United States Plywood Corp.,[19] which are as follows:

> 1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.
> 2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.
> 3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.
> 4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

---

[19] 318 F.Supp. 1116, 1120 (S. D. N.Y. 1970).

10

5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

7. The duration of the patent and the term of the license.

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agree upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that, the amount which a prudent licensee– who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention– would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

In Micro Chemical, Inc. v. Lextron, Inc.,[20] the court allowed an expert's testimony and opinions concerning damages of the plaintiff utilizing a reasonable royalty approach and relying on the Georgia Pacific factors methodology. In Mosanto v. David,[21] the court stated that "Rule 703 expressly authorizes the admission of expert opinion that is based on 'facts or data that themselves

---

[20] 317 F.3d 1387 (Fed. Cir. 2003)

[21] 513 F.3d 1009, 1016 (Fed. Cir. 2008).

are inadmissible as long as the evidence relied upon is of a type reasonably relied upon by experts in the particular field in forming opinions."[22]

Based on the foregoing, and the lack of sales receipts made available by defendants, the court finds that defendants' challenge to Davis' report and testimony lacks merit. As noted by plaintiffs, defendants can raise these arguments through vigorous cross examination and presentation of contrary evidence.

## **ORDER**

Based on the foregoing, the motion to exclude plaintiffs' expert, Donald Davis, is hereby **DENIED**.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 25th day of August, 2014.

_____
JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE

---

[22] See Monsanto Co. v. Ralph, 382 F.3d 1374 (Fed. Cir. 2004)(allowing the reasonable royalty approach in calculating damages). See also Monsanto v. Byrd, 2000 WL 3395226 (E.D.N.C. ); Monsanto v. Strickland, 604 F.Supp. 2d 805 (D.S.C. 2009).